**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

JEFFREY SCOTT SUIT
CYNTHIA ANN SUIT
a/k/a CYNTHIA ANN STEPHENS
d/b/a BLUE RIDGE PUPPIES

        Debtors

RONALD HELIN

        Plaintiff

    v.

JEFFREY SCOTT SUIT and
CYNTHIA ANN SUIT

        Defendants

Case No.  08-31908

Adv. Proc. No.  08-3090

# M E M O R A N D U M

**APPEARANCES:**    SCOTT D. HALL, ESQ.
    105 East Bruce Street
    Sevierville, Tennessee  37862
    Attorney for Plaintiff

                JOHN H. FOWLER, ESQ.
    112 Bruce Street
    Sevierville, Tennessee  37862
    Attorney for Debtors/Defendants

**RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE**

This adversary proceeding is before the court upon the Complaint For Adversary Proceeding (Complaint) filed by the Plaintiff, Ronald Helin, on July 3, 2008, as amended July 10, 2008, seeking a determination that a judgment obtained against the Debtors/Defendants in the amount of $65,547.55 in the Chancery Court for Sevier County, Tennessee, is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).

The trial was held on January 26, 2009. The record before the court consists of twenty-two exhibits introduced into evidence, along with the testimony of three witnesses, Britta Mansfield, the Plaintiff, and the Defendant, Jeffrey Scott Suit. For clarification purposes, all references to the Defendant are solely to Jeffrey Scott Suit, while references to the Defendants includes Cynthia Ann Suit.

This is a core proceeding. 28 U.S.C. § 157(b)(2)(I) (2006).

I

From 1998 to 2002, and once again from 2003 through 2007, the Defendant was employed as a medical technician for Orthopaedic Laser Technologies, Inc. (OLT, Inc.), an Ohio corporation which rents medical equipment to facilities and provides surgical supplies and technical support for operation of the equipment. The Plaintiff has served as president of OLT, Inc. for sixteen years. In 2004, the Defendant relocated from Ohio to North Carolina, receiving a substantial raise, and on August 24 2004, the Defendants purchased a house located at 4100 Mariah Drive, Lenoir, North Carolina (North Carolina Residence). The Plaintiff, through OLT, Inc., agreed to help with overlapping expenses on the Defendants' house in Ohio and, to that end, OLT, Inc. issued the

2

Defendant checks for three months of expenses, including payments on the Defendants' mortgage obligation for their Ohio house. *See* COLL. TRIAL EX. 24. Additionally, the Defendant borrowed $4,500.00 from OLT, Inc., which was repaid by deductions from his paycheck in payments of approximately $120.00 per month.

After two years in North Carolina, and after losing a large account in Durham, the Plaintiff was approached by the Defendant about relocating to Tennessee and opening a new territory. The Plaintiff agreed and, in order to assist the Defendant with the financial burden of moving, co-signed in August 2006, individually with the Defendant, a note with Sky Bank for $62,803.00 (First Sky Bank Note), representing the equity in the North Carolina Residence, thus providing the Defendants funds to purchase a house in Tennessee. In exchange, the Plaintiff and the Defendant agreed that once the North Carolina Residence sold, the First Sky Bank Note would be paid off. Thereafter, on August 22, 2006, the Defendants purchased a residence at 2085 Arch Rock Dr., Sevierville, Tennessee (Tennessee Residence). *See* TRIAL EX. 17. At the Defendant's request, in order to assist with the purchase of the Tennessee Residence, Britta Mansfield, Business Manager for OLT, Inc., sent a fax addressed to Terrie McVey, a loan officer with Wells Fargo, stating OLT, Inc. was "taking over financial responsibility" of the North Carolina Residence "until it is sold" and that OLT, Inc. had "advanced [the Defendant] the equity from his house in the amount of $62,500.00 for the purchase of his new house" referencing checks from Sky Bank TRIAL EX. 16.

Following the purchase of the Tennessee Residence in August 2006, the Defendants did not make the required payments on the loan secured by the North Carolina Residence, which went into default, and foreclosure proceedings were commenced. *See* TRIAL EXS. 1-4. The Defendants each

received notice of a hearing on the foreclosure scheduled for December 19, 2006, at 2:30 p.m. in the Caldwell County Clerk of Court's office via certified mail, return receipt requested. Both return receipts were signed for on December 2, 2006, by the Defendant. TRIAL EX. 5. By letters dated December 19, 2006, the Defendants were each notified via certified mail by Brock & Scott, PLLC, Substitute Trustee in the foreclosure proceedings, that a foreclosure sale on the North Carolina Residence had been scheduled for January 9, 2007, at 2:00 p.m. TRIAL EXS. 7-9; TRIAL EX. 18 at p. 16, line 20 through p. 18, line 9. The foreclosure sale proceeded as scheduled and on January 23, 2007, the Substitute Trustee executed a Substitute Trustee's Deed conveying the North Carolina Residence to Countrywide Home Loans, which was recorded with the Register of Deeds for Caldwell County, North Carolina, on January 29, 2007. TRIAL EX. 11.

In early 2007, the matured First Sky Bank Note had not been paid off, and on February 8, 2007, the Plaintiff and Defendant executed a Promissory Note and Disclosure with Sky Bank (Second Sky Bank Note), Loan No. 1202121578, in the amount of $62,803.00, calling for five (5) monthly interest payments with the final principal and interest payment due on August 18, 2007. TRIAL EX. 22. From the proceeds of the Second Sky Bank Note, $62,653.00 went to pay off the balance owing by the Plaintiff and Defendant on the First Sky Bank Note, and $150.00 represented a "Prepaid Finance Charge." The Plaintiff and Defendant were also joint obligors under the Second Sky Bank Note and were jointly and severally liable for its repayment. Thereafter, and in association with the Second Sky Bank Note, on February 22, 2007, the Defendants executed a Promissory Note to the Plaintiff in the amount of $62,803.00, containing the following terms:

> The undersigned agrees to make all payments including interest on a Note with Sky Bank (Sky Bank Note) being Loan Number 1202121578 in the original amount of

4

> $62,803.00 which was a bridge loan to enable the undersigned to purchase the real estate located at 2085 Archrock Drive, Sevierville, Tennessee, and Ronald Helin co-signed said loan to enable the undersigned to obtain the Sky Bank loan.
>
> The undersigned further agrees that upon selling or other transfer of the real estate located at 4100 Mariah Court, Lenoir, NC 28645, the undersigned shall immediately pay off the above loan to Sky Bank and thereby releasing Ronald Helin from any and all liability on the Sky Bank Note.
>
> In the event the undersigned fails to pay any payment due on the Sky Bank Note within 15 days of said payment due date, or in the event the undersigned defaults on any terms or conditions of the Sky Bank Note or in the event the undersigned sells or otherwise transfers the real estate located at 4100 Mariah Court, Lenoir, NC 28645 and fails to pay off the Sky Bank Note within five days from the date of sale or transfer of said property, then at the option of the Payee the entire balance of this note shall become immediately due and payable and this Note shall bear interest at 8.0% per annum from the date of this Note.

TRIAL EX. 13. The Plaintiff was unaware that the North Carolina Residence had been foreclosed upon when the February 8, 2007 Second Sky Bank Note and/or the February 22, 2007 Promissory Note with the Defendants were executed.

In early May 2007, the Plaintiff discovered, through an online search, that the North Carolina Residence had been foreclosed. Soon thereafter, the Defendant advised the Plaintiff that he was suffering from medical problems and had suffered the first of three minor strokes on May 10, 2007, which required hospitalization for a few days. In June 2007, the Plaintiff made a trip to Tennessee in order to meet with the Defendant concerning the foreclosure and his personal problems. At some time later that month, the Defendant left his employment with OLT, Inc.

After the Plaintiff paid off the Second Sky Bank Note, he filed a lawsuit against the Defendants for the amount of the Promissory Note in the Chancery Court for Sevier County, Tennessee, in a case styled *Helin v. Suit*, No. 07-8-351. On October 5, 2007, an Order for Default

Judgment was entered awarding the Plaintiff a judgment against the Defendants in the amount of $65,547.55, together with 8.5% interest (Default Judgment). TRIAL EX. 14. On April 30, 2008, the Defendants filed the Voluntary Petition commencing their Chapter 7 bankruptcy case. The Plaintiff filed the Complaint initiating this adversary proceeding on July 3, 2008, seeking a determination that the Default Judgment is nondischargeable. The Plaintiff avers the Defendants fraudulently, and with intent to deceive, did not disclose that the North Carolina Residence had been foreclosed upon when they executed the February 22, 2007 Promissory Note, and that he reasonably relied upon their misrepresentations, which resulted in his having to pay off the Second Sky Bank Note he had co-signed with the Defendant. The Defendants deny that they made any false representations, arguing that they were unaware at the time they executed the February 22, 2007 Promissory Note to the Plaintiff that the foreclosure had taken place.

II

The dischargeability of debts is governed by 11 U.S.C. § 523, which provides, in material part:

> (a) A discharge under section 727[1], . . . of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

---

[1] Chapter 7 debtors receive a discharge of pre-petition debts, "[e]xcept as provided in section 523 of this title[.]" 11 U.S.C. § 727(b) (2005). This accomplishes the goals of Chapter 7 to relieve "honest but unfortunate" debtors of their debts and allow them a "fresh start" through this discharge. *Buckeye Retirement, LLC v. Heil (In re Heil),* 289 B.R. 897, 901 (Bankr. E.D. Tenn. 2003) (quoting *In re Krohn,* 886 F.2d 123, 125 (6th Cir. 1989) (citing *Local Loan Co. v. Hunt,* 54 S.Ct. 695, 699 (1934))). The Order granting the Defendants' discharge was entered on September 11, 2008.

6

> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

11 U.S.C. § 523(a).  The party seeking a determination of nondischargeability bears the burden of proving the necessary elements by a preponderance of the evidence, *Grogan v. Garner*, 111 S. Ct. 654, 661 (1991), and § 523(a) is strictly construed against the Plaintiff but liberally in favor of the Defendants.  *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998);  *Haney v. Copeland (In re Copeland)*, 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003).  Nevertheless, all elements must be proved against each defendant individually.  *See, e.g., Myers v. Ostling (In re Ostling)*, 266 B.R. 661, 665 (Bankr. E.D. Mich. 2001).

To satisfy § 523(a)(2)(A), the Plaintiff must prove that the Defendants obtained money, property, or services through material misrepresentations that they knew were false or were made with gross recklessness, that the Defendants intended to deceive the Plaintiff, that the Plaintiff justifiably relied on the Defendant's false representations, and that the Plaintiff's reliance was the proximate cause of his losses.  *See Copeland*, 291 B.R. at 760 (citing *Rembert*, 141 F.3d at 280).

First, the Plaintiff must prove that the Defendants engaged in somewhat "blameworthy" conduct, whereby the court may infer fraudulent intent based on the totality of the circumstances. *Copeland*, 291 B.R. at 759.  Material misrepresentations, omissions, and actual fraud all fall within the scope of § 523(a)(2)(A).  *Copeland*, 291 B.R. at 759.

> "[F]alse pretense" involves implied misrepresentation or conduct intended to create and foster a false impression, as distinguished from a "false representation" which is an express misrepresentation[, while a]ctual fraud "consists of any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent

7

> and cheat another - something said, done or omitted with the design of perpetrating what is known to be a cheat or deception."

*Copeland*, 291 B.R. at 760 (citations omitted); *see also Peoples Sec. Fin. Co., Inc. v. Todd (In re Todd)*, 34 B.R. 633, 635 (Bankr. W.D. Ky. 1983) ("For the purposes of § 523(a)(2)(A), 'false representations and pretenses encompass statements that falsely purport to depict current or past facts.'"). On the other hand,

> a broken promise to repay a debt, without more, will not sustain a cause of action under § 523(a)(2)(A). Instead, central to the concept of fraud is the existence of scienter which, for the purposes of § 523(a)(2)(A), requires that it be shown that at the time the debt was incurred, there existed no intent on the part of the debtor to repay the obligation.

*EDM Mach. Sales, Inc. v. Harrison (In re Harrison)*, 301 B.R. 849, 854 (Bankr. N.D. Ohio 2003) (citations omitted). Similarly, intent to deceive requires proof that the Defendants made false representations that they knew or should have known would convince the Plaintiff to make the loan. *Copeland*, 291 B.R. at 765-66. "'Fraudulent intent requires an actual intent to mislead, which is more than mere negligence. . . . A 'dumb but honest' [debtor] does not satisfy the test[,]'" and intent may be inferred by examining the Defendants' conduct to determine if they presented the Plaintiff with "'a picture of deceptive conduct . . . indicat[ing] an intent to deceive.'" *Copeland*, 291 B.R. at 766 (quoting *Palmacci v. Umpierrez*, 121 F.3d 781, 788 (1st Cir. 1997), and *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492 (Bankr. D. Colo. 2002)).

Finally, the Plaintiff must prove that he actually relied upon the Defendants' representations, that his reliance was justifiable, based upon the facts and circumstances known to him at the time, and that his reliance was the proximate cause for the loss he sustained. *Copeland*, 291 B.R. at 766-67. The court may find the Plaintiff's reliance justifiable even if he "'might have ascertained the

falsity of the representation had [he] made an investigation.'" *Copeland*, 291 B.R. at 767 (quoting *Commercial Bank & Trust Co. v. McCoy (In re McCoy)*, 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001)). Furthermore, "[p]roximate cause is something more than 'speculation as to what the creditor might have done in hypothetical circumstances[,]' depending upon 'whether the . . . conduct has been so significant and important a cause that the [debtor] should be legally responsible.'" *Copeland*, 291 B.R. at 767 (quoting *Candland v. Ins. Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996), and *Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991)). Without "a direct link between the alleged fraud and the creation of the debt[,]" there is no proximate cause and the element is not satisfied. *Copeland*, 291 B.R. at 767 (quoting *McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 n.7 (1st Cir. 2001)).

The first inquiry is whether the Defendants made any material misrepresentations to the Plaintiff at the time they executed the Promissory Note on February 22, 2007, and if so, whether they did so with an intent to deceive. Based upon the record and the testimony at trial, the court holds that the answer to both questions is yes.

The record reflects that the firm of Brock & Scott, PLLC, in Wilmington, North Carolina, sent the letters dated November 16, 2006, which were entered into evidence as Trial Exhibits 1 through 4, addressed to each of the Defendants at both the North Carolina Residence and the Tennessee Residence addresses, advising that a hearing would be held on December 19, 2006, in the Caldwell County Clerk of Court's office in connection with the foreclosure sale of the North Carolina Residence. These letters were sent via certified mail, and on December 2, 2006, the Defendant signed for the letters addressed to him and Cynthia Suit at the North Carolina Residence.

9

TRIAL EX. 5. Following the hearing on December 19, 2006, Brock & Scott, PLLC, as Substitute Trustee in the foreclosure proceeding, sent the letters entered into the record as Trial Exhibits 7 through 10, which were once again addressed to each of the Defendants at both the North Carolina Residence and the Tennessee Residence addresses, this time advising that the foreclosure sale had been scheduled and attaching the notice of sale. *See also* TRIAL EX. 18 at p.16, line 20 through p. 18, line 9.

When questioned at trial, the Defendant testified that he and his wife received the November 16, 2006 letters from Brock & Scott, PLLC in December or January, after which he contacted Ms. Mansfield and was assured that things would be taken care of, but that he does not recall receiving the December 19, 2006 letters. He also testified that on February 22, 2007, the date they executed the Promissory Note, the Defendants were unaware that the foreclosure sale had occurred. The Defendant's testimony was not, however, corroborated by Ms. Mansfield, who testified that she was never told that the North Carolina Residence was being foreclosed upon or that there were problems with the mortgage not being paid, nor did she and the Defendant ever have a conversation about OLT, Inc. making the payments for the Defendant.[2] Similarly, the Plaintiff testified that at the time the Defendants executed the Promissory Note, the Defendant never

---

[2] At trial, a great deal of the proof centered around the events concerning the Defendants' move to Tennessee and the conflicting testimony of the Defendant and the Plaintiff regarding whether or not OLT, Inc. had agreed to purchase and/or take financial responsibility for the North Carolina Residence, whether the parties had discussions about the Defendants' ability to afford loans on both the North Carolina and Tennessee Residences, and the representations contained in the fax marked as Trial Exhibit 16, which was sent to Wells Fargo by Ms. Mansfield. All of this testimony and the evidence supporting and/or negating it, however, is irrelevant to the § 523(a)(2)(A) inquiry, which focuses solely upon the events directly related to the execution of the February 22, 2007 Promissory Note and whether the Defendants misrepresented their ownership interest in the North Carolina Residence when they signed it. Any previous agreements or arrangements concerning the purchase of and/or closing upon the Tennessee Residence in August 2006, are not material to whether the Defendants entered into the February 22, 2007 Promissory Note under false pretenses or made material misrepresentations with an intent to deceive the Plaintiff. Furthermore, those issues could have been addressed in the state court lawsuit resulting in the Default Judgment and raise collateral estoppel questions.

10

mentioned problems with the North Carolina Residence, stating only that it was still for sale, and that he and the Defendant did not discuss OLT, Inc. making payments on it.

In addition to the foregoing discrepancies between the testimony of the witnesses which evidences non-action of the Defendants in failing to inform the Plaintiff that a foreclosure action against the North Carolina Residence was even pending, much less that it had been scheduled and/or held, their intent to deceive is further supported by the actions of the Defendant, who, on April 3, 2007, sent the following email message to the Plaintiff in perpetuation of the misrepresentation that they still owned the North Carolina Residence:

> Ron, After two days of pure hell, there are some things I need to get off my chest. Let me tell you arout [sic] getting divorced. After two 16hour days at work I get a call from my crying wife that our house payment has rounced [sic] recause [sic] : 1. I am paying 500 amonth [sic] interest payments. 2. I am paying 125 for the first move. 3. I had to pay 400 out of my account for rental truck i [sic] am loosing [sic] money for reeing [sic] a loyal employee. I have uprooted my family twice to try and grow the company. I relieve [sic] I have succeded. [sic] The way we were treated in the move to Tenn. was not a good thing. **I was not told you were not ruying [sic] the house until it was much to [sic] late for me to chnge [sic] anything. I have reen [sic] paying two house payments plus the loan interest, and I am going rroke! [sic]** I might re [sic] arle [sic] to live with this if I was appreciated. Idon't [sic] feel it. I am down here isolated and do not feel like I have any future. I felt like I was doing what was necessary to open this area, and I am loosing [sic] money. Explain this one to your wife and see the reaction. I do not complain to others. Ifeel [sic] like I have given more than my shore to OLT. I can not continue this way. I have lost the will todo this anymore. I once again had to tell the doctors I just trained that I have no rusiness [sic] cards. Pretty emrasrrassing. [sic] Someone nneeds [sic] to cover this area for the rest of the week so that I can possirly [sic] ressurect [sic] my marriage. And ry [sic] the way, my phone doesn't work either.

TRIAL EX. 21 (emphasis added). The Plaintiff testified that he was upset when he received this email because he believed the Defendant was having marital problems due to his finances and that he interpreted the portions of this email the court has emphasized to mean that the Defendants were

11

paying for both the Tennessee Residence and the North Carolina Residence. Shortly after receiving this email, the Plaintiff drove to Tennessee to trade vehicles with the Defendant and to assure him that he cared about his family's welfare. In addition, the Plaintiff stopped deducting bridge loan interest payments of approximately $500.00 per month from the Defendant's paycheck and gave the Defendant a check drawn on OLT, Inc.'s account in the amount of $750.00. TRIAL EX. 20.

The Defendant acknowledged at trial that after closing on the Tennessee Residence, the Defendants made no further payments on the North Carolina Residence. And although he also testified, as he had at his meeting of creditors held on June 3, 2008, that he learned of the foreclosure sale in March 2007, which the court finds questionable in light of the Defendant's testimony that he recalled receiving the November 16, 2006 letters concerning the foreclosure hearing from Brock & Scott, PLLC, there is no question that, at the latest, the Defendant knew that he did not own the North Carolina Residence in March 2007, when he sent the April 3, 2007 email to the Plaintiff thus perpetuating the fraud.[3]

The Plaintiff seeks a determination of nondischargeability against both Defendants, on the basis that Cynthia Suit also executed the Promissory Note on February 22, 2007, knowing that the house in North Carolina had been foreclosed upon, and all actions taken by the Defendant are imputed to her as well. "It is generally held that the marriage relationship itself is an inappropriate

---

[3] Based upon the Defendant's inconsistent testimony and the record as a whole, the Defendant's representations in this email message that he had been paying two house payments plus the interest on the Second Sky Bank Note, which was being deducted from his paycheck in the amount of approximately $500.00 per month, were not simply misleading, they were false and, while they are not, in and of themselves, material misrepresentations by which the Default Judgment may be determined nondischargeable, they are misrepresentations that the court has considered in conjunction with the Defendants' conduct prior thereto, as further proof of the Defendants' intent to deceive the Plaintiff when they executed the Promissory Note on February 22, 2007.

12

basis for imputing fraud." *Tsurakawa v. Nikon Precision, Inc. (In re Tsurakawa)*, 287 B.R. 515, 526 (B.A.P. 9th Cir. 2002); *see also Ostling*, 266 B.R. at 665 (holding that because the husband and wife relationship, in and of itself, is insufficient to impute liability between spouses, a legal relationship in addition to the marriage must exist). "Fraudulent intent may not be imputed from one spouse to another simply based on the marital relationship of the parties. In order for liability to attach, the person to whom intent is sought to be imputed must be aware of the spouse's misconduct and must participate in the use or enjoyment of the ill-gotten gains." *Auto. Fin. Corp. v. Vasile (In re Vasile)*, 297 B.R. 893, 902 (Bankr. M.D. Fla. 2003). Similarly, under Tennessee law, the court will not assume a partnership or agency relationship between the Defendants simply because they are married. *See Martin v. Coleman*, 19 S.W.3d 757, 761 (Tenn. 2000). While "there is no doubt that a married person may be authorized to act for the other spouse, . . . authority in this connection will not be implied from the marital relation." *Goode v. Daugherty*, 694 S.W.2d 314, 317 (Tenn. Ct. App. 1985) (quoting 41 AM. JUR. 2D *Husband and Wife* § 241 (1968)).

Nevertheless, in this case, the court has no difficulty in finding that any fraud of the Defendant should be imputed to Cynthia Suit. She executed the Promissory Note on February 22, 2007, all the while having the same notice of the foreclosure hearing as evidenced by Trial Exhibits 1 through 5, but choosing to remain silent as to the status of the North Carolina Residence.

The court also finds that the Plaintiff reasonably relied upon the Defendants' representations that they continued to own the North Carolina Residence on February 22, 2007, when they executed the Promissory Note. This is evident not only from the terms of the Promissory Note, which provides that the Second Sky Bank Note would be paid from the sale proceeds realized from the sale

of the North Carolina Residence, *see* TRIAL EX. 13, but also from the Plaintiff's credible testimony at trial and the record as a whole. When asked directly, the Plaintiff testified that he was unaware, on February 22, 2007, when the Promissory Note was executed, that the North Carolina Residence had been foreclosed or was in any danger of being foreclosed upon, that had he known, he would have discussed options with the Defendants and assisted them, that he never would have allowed the North Carolina Residence to go to foreclosure, and that he had relied upon their representations that the house was still being marketed for sale by the Defendants.

As the Plaintiff testified at trial and as is supported by the record, before the foreclosure of the North Carolina Residence, the Defendant had kept the Plaintiff apprised when the Defendants were having financial difficulties during the time he was employed by OLT, Inc. and the Plaintiff had consistently followed through by providing the Defendants with financial assistance. The evidence reflects that the Defendant received financial assistance from the Plaintiff through OLT, Inc. when he relocated from Ohio to North Carolina, not only in the form of a substantial raise from $1,700.00 to $2,500.00 per pay period, but also in the payment of his moving expenses and three months' expenses totaling approximately $7,325.00 between March and June 2004. *See* COLL. TRIAL EX. 24. The record also evidences that when the Defendant decided to relocate to Tennessee, the Plaintiff, in August 2006, co-signed for the Defendant's First Sky Bank Note for $62,803.00 for the Defendants to use as a down-payment on the Tennessee Residence, and when he believed the Defendants were having marital problems due to their financial condition in April 2007, the Plaintiff, again through OLT, Inc., gave the Defendants $750.00 and stopped deducting $500.00 interest payments toward the Second Sky Bank Note from the Defendant's paycheck. *See* TRIAL EX. 20.

14

Nevertheless, although the record clearly establishes that the Plaintiff relied upon the Defendants' false pretense with respect to their continued ownership of the North Carolina Residence despite having notice of the foreclosure sale and their misrepresentations that they were still marketing the North Carolina Residence for sale when they executed the Promissory Note on February 22, 2007, the record also clearly establishes that the Plaintiff did not obtain money, property, or services from the Defendants through their execution of the February 22, 2007 Promissory Note, nor was the Plaintiff's reliance on the Defendants' misrepresentations the proximate cause of his loss. Accordingly, the first and final elements of § 523(a)(2)(A) have not been satisfied.

The Default Judgment was based upon the Defendants' obligation to the Plaintiff resulting from their execution of the February 22, 2007 Promissory Note. The Promissory Note, however, is not the basis for the Plaintiff's loss. The Promissory Note refers to and conditions the Defendants' obligations thereunder on repayment of the February 8, 2007 Second Sky Bank Note, for which the Plaintiff was a joint obligor. *See* TRIAL EX. 13. While the Promissory Note establishes the liability of the Defendants to the Plaintiff in the event that the Second Sky Bank Note was not paid, the Plaintiff's co-signing of the Second Sky Bank Note on February 8, 2007, served as the vehicle through which the $62,803.00 was obtained and his repayment of that obligation was the proximate cause of his loss. The Plaintiff was an obligor under the Second Sky Bank Note and thus liable for the payment of that note in its entirety. The representations of the Defendants regarding the February 22, 2007 Promissory Note had no bearing on or relationship to the Plaintiff's obligations under the Second Sky Bank Note. To state it another way, the Defendants' execution of the

Promissory Note on February 22, 2007, in favor of the Plaintiff in no way eliminated or reduced his obligation to repay the $62,803.00 Second Sky Bank Note, nor did the Defendants receive anything in the form of money, property, or services from it, having received the monies the Default Judgment is based upon in August 2006.

In summary, the court finds as follows: (1) that the Defendants executed the February 22, 2007 Promissory Note to the Plaintiff, agreeing "that upon selling or other transfer of the real estate located at 4100 Mariah Court, Lenoir, NC 28645, [they would] immediately pay off the . . . loan to Sky Bank . . . releasing [the Plaintiff] from any and all liability on the Sky Bank Note," under false pretenses, based upon the misrepresentation that they still owned the North Carolina Residence even though they knew or should have known that it had been foreclosed upon and they no longer held any ownership interest therein; (2) that the Plaintiff justifiably relied upon the Defendants' representations; (3) that the Plaintiff did not obtain money, property, or services under the February 22, 2007 Promissory Note; and (4) that the Defendants' representations under the February 22, 2007 Promissory Note were not the proximate cause of the Plaintiff's loss of the $62,803.00 plus interest which he repaid to Sky Bank under the terms of the Second Sky Bank Note. Therefore, the $65,547.55 Default Judgment entered by the Chancery Court for Sevier County, Tennessee, on October 5, 2007, was discharged on September 11, 2008.

A judgment consistent with this Memorandum will be entered.

FILED:  April 6, 2009

                                      BY THE COURT

                                      */s/  RICHARD STAIR, JR.*

                                      RICHARD STAIR, JR.
                                      UNITED STATES BANKRUPTCY JUDGE